Nos. 17-2231 (L), 17-2232, 17-2233, 17-2240 (Consolidated)

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

INTERNATIONAL REFUGEE ASSISTANCE PROJECT, a project of the Urban Justice Center, Inc., on behalf of itself and its clients; HIAS, INC., on behalf of itself and its clients; JOHN DOES #1 AND 3; JANE DOE #2; MIDDLE EAST STUDIES ASSOCIATION OF NORTH AMERICA, INC., on behalf of itself and its members; MUHAMMED METEAB; PAUL HARRISON; IBRAHIM AHMED MOHOMED; ARAB AMERICAN ASSOCIATION OF NEW YORK, on behalf of itself and its clients,
*Plaintiffs – Appellees*,

and ALLAN HAKKY; SAMANEH TAKALOO,
*Plaintiffs,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; DEPARTMENT OF STATE; OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE; ELAINE C. DUKE, in her official capacity as Acting Secretary of Homeland Security; REX TILLERSON, in his official capacity as Secretary of State; DANIEL R. COATS, in his official capacity as Director of National Intelligence,
*Defendants – Appellants.*

No. 17-2231 (L)
On Cross-Appeal from the United States District Court
for the District of Maryland, Southern Division
(8:17-cv-00361-TDC)

[Caption continued on inside cover]

## FIRST CROSS-APPEAL BRIEF FOR APPELLANTS

NOEL J. FRANCISCO
*Solicitor General*

JEFFREY B. WALL
EDWIN S. KNEEDLER
*Deputy Solicitors General*

CHAD A. READLER
*Acting Assistant Attorney General*

STEPHEN M. SCHENNING
*Acting United States Attorney*

HASHIM M. MOOPPAN
*Deputy Assistant Attorney General*

DOUGLAS N. LETTER
SHARON SWINGLE
H. THOMAS BYRON III
LOWELL V. STURGILL JR.
*Attorneys, Appellate Staff*
*Civil Division, Room 7241*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 353-2689*

—————————————

No. 17-2232
(8:17-cv-02921-TDC)

—————————————

IRANIAN ALLIANCES ACROSS BORDERS; JANE DOE #1; JANE DOE #2; JANE DOE #3;
JANE DOE #4; JANE DOE #5, JANE DOE #6,

*Plaintiffs – Appellees,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States; ELAINE C. DUKE, in
her official capacity as Acting Secretary of Homeland Security; KEVIN K. MCALEENAN, in his official
capacity as Acting Commissioner of U.S. Customs and Border Protection; JAMES MCCAMENT, in his
official capacity as Acting Director of U.S. Citizenship and Immigration Services; REX TILLERSON;
JEFFERSON B. SESSIONS III, in his official capacity as Attorney General of the United States,

*Defendants – Appellants.*

—————————————

No. 17-2233
(1:17-cv-02969-TDC)

—————————————

EBLAL ZAKZOK; SUMAYA HAMADMAD; FAHED MUQBIL; JOHN DOE #1; JOHN DOE #2;
JOHN DOE #3,

*Plaintiffs – Appellees,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States; UNITED STATES
DEPARTMENT OF HOMELAND SECURITY; UNITED STATES DEPARTMENT OF STATE;
ELAINE C. DUKE, in her official capacity as Acting Secretary of Homeland Security; REX
TILLERSON, in his official capacity as Secretary of State,

*Defendants – Appellants.*

————————————

No. 17-2240
(8:17-cv-00361-TDC)

————————————

INTERNATIONAL REFUGEE ASSISTANCE PROJECT, a project of the Urban Justice Center, Inc., on behalf of itself and its clients; HIAS, INC., on behalf of itself and its clients; JOHN DOES #1 AND 3; JANE DOE #2; MIDDLE EAST STUDIES ASSOCIATION OF NORTH AMERICA, INC., on behalf of itself and its members; MUHAMMED METEAB; ARAB AMERICAN ASSOCIATION OF NEW YORK, on behalf of itself and its clients,

*Plaintiffs – Appellants*,

and PAUL HARRISON; IBRAHIM AHMED MOHOMED; ALLAN HAKKY; SAMANEH TAKALOO,

*Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; DEPARTMENT OF STATE; OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE; ELAINE C. DUKE, in her official capacity as Acting Secretary of Homeland Security; DANIEL R. COATS, in his official capacity as Director of National Intelligence,

*Defendants – Appellees*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................1

STATEMENT OF JURISDICTION.........................................................4

STATEMENT OF THE ISSUE ...............................................................4

STATEMENT OF THE CASE.................................................................4

     A.     Statutory Background........................................................4

     B.     Executive Order No. 13,780..............................................6

     C.     Proclamation No. 9645......................................................8

     D.     District Court Injunction .................................................12

SUMMARY OF ARGUMENT ..............................................................16

STANDARD OF REVIEW ...................................................................19

ARGUMENT .......................................................................................19

I.     Plaintiffs' Claims Are Not Justiciable.........................................19

     A.     Plaintiffs' Statutory Claims Are Not Justiciable..............19

     B.     Plaintiffs' Establishment Clause Claims Are
              Not Justiciable ................................................................25

II.     Plaintiffs Do Not Have A Likelihood Of Success On The
      Merits Of Their Statutory Or Constitutional Claims....................28

     A.     The Proclamation Is Consistent With The INA .................29

1.  The President Has Extremely Broad Discretion To Suspend Entry Of Aliens Abroad ........................................29

2.  The Proclamation Is Fully Justified By The President's National-Security And Foreign-Affairs Judgments ...............................................................................32

3.  Section 1152(a)(1)'s Prohibition On Nationality Discrimination In Issuing Immigrant Visas Does Not Restrict The President's Authority To Suspend Entry .............34

B.  The Proclamation Is Consistent With The Establishment Clause ...........................................................39

1.  The Proclamation Is Constitutional Under *Mandel* Because It Relies On Facially Neutral And Bona Fide Reasons ...............................................................................40

2.  The Proclamation Is Valid Under *McCreary* .............................43

III.   The Balance Of Harms Weighs Strongly Against Preliminary Relief ..........53

A.  The District Court's Injunction Imposes Serious, Irreparable Harm On The Government And The Public ....................................... 53

B.  A Preliminary Injunction Is Not Necessary To Prevent Any Substantial Harm To Plaintiffs ........................................... 55

CONCLUSION .................................................................................56

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ii

# TABLE OF AUTHORITIES

**Cases:** <span style="float:right">**Page(s)**</span>

*Abourezk v. Reagan*,
  785 F.2d 1043 (D.C. Cir. 1986),
  *aff'd by an equally divided Court*, 484 U.S. 1 (1987) .............................. 21-22, 29

*Allen v. Wright*,
  468 U.S. 737 (1984) ..................................................................................27

*Allende v. Shultz*,
  845 F.2d 1111 (1st Cir. 1988) ............................................................... 29, 30

*Block v. Community Nutrition Inst.*,
  467 U.S. 340 (1984) ..................................................................................24

*Camreta v. Greene*,
  563 U.S. 692 (2011) ....................................................................................7

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1993) ..................................................................................43

*Dalton v. Specter*,
  511 U.S. 462 (1994) ..................................................................................30

*Department of Navy v. Egan*,
  484 U.S. 518 (1988) ..................................................................................33

*Direx Israel, Ltd. v. Breakthrough Med. Corp.*,
  952 F.2d 802 (4th Cir. 1992) ....................................................................55

*Fiallo v. Bell*,
  430 U.S. 787 (1977) ..................................................................................19

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ..................................................................................22

*Haig v. Agee*,
  453 U.S. 280 (1981) ............................................................................. 30, 53

*Harisiades v. Shaughnessy*,
  342 U.S. 580 (1952) ................................................................21

*Hawaii v. Trump*:
  245 F. Supp. 3d 1227 (D. Haw. 2017) ...............................7
  859 F.3d 741 (9th Cir. 2017) ................................... 7, 36

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010) ......................................................... 52, 53

*International Union of Bricklayers v. Meese*,
  761 F.2d 798 (D.C. Cir. 1985) ....................................... 22

*IRAP v. Trump*:
  241 F. Supp. 3d 539 (D. Md. 2017) .............................. 7, 35
  857 F.3d 554 (4th Cir. 2017) ....................... 7, 21, 28, 40, 41

*Jackson v. Okaloosa Cty.*,
  21 F.3d 1531 (11th Cir. 1994) .......................................23

*Kerry v. Din*,
  135 S. Ct. 2128 (2015) ........................................ 26, 28, 42

*Kleindienst v. Mandel*,
  408 U.S. 753 (1972) ........................... 15, 18, 25, 26, 28, 39, 40, 41, 42

*League of Women Voters of N.C. v. North Carolina*,
  769 F.3d 224 (4th Cir. 2014) .........................................10

*Legal Assistance for Vietnamese Asylum Seekers v. Department of
  Justice*, 45 F.3d 469 (D.C. Cir. 1995), *vacated on other grounds*,
  519 U.S. 1 (1996) ............................................... 22, 24

*Lewis v. Casey*,
  518 U.S. 343 (1996) ......................................................56

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) ......................................................24

iv

*Madsen v. Women's Health Ctr., Inc.*,
512 U.S. 753 (1994) ...........................................................................56

*Malek-Marzban v. INS*,
653 F.2d 113 (4th Cir. 1981) ...................................................... 31-32, 36

*Maryland v. King*,
567 U.S. 1301 (2012) ..........................................................................54

*McCreary County v. ACLU of Kentucky*,
545 U.S. 844 (2005) ............................................................ 39, 43, 45, 46

*McGowan v. Maryland*,
366 U.S. 420 (1961) ..................................................................... 26, 46

*Morfin v. Tillerson*,
851 F.3d 710 (7th Cir. 2017), *cert. denied*,
2017 WL 3136962 (U.S. Oct. 30, 2017) ............................................. 42

*Nademi v. INS*,
679 F.2d 811 (10th Cir. 1982) .............................................................32

*In re Navy Chaplaincy*,
534 F.3d 756 (2008), *cert. denied*, 556 U.S. 1167 (2009) ...................................28

*Nixon v. Fitzgerald*,
457 U.S. 731 (1982) ............................................................................54

*NLRB v. SW Gen., Inc.*,
137 S. Ct. 929 (2017) ....................................................................... 39

*O Centro Espirita Beneficiente Uniao de Vegetal v. Ashcroft*,
314 F.3d 463, 467 (10th Cir. 2002)................................................... 54

*PBM Prods., LLC v. Mead Johnson & Co.*,
639 F.3d 111 (4th Cir. 2011) ..............................................................19

*Radzanower v. Touche Ross & Co.*,
426 U.S. 148 (1976) ...........................................................................34

*Reno v. American-Arab Anti-Discrimination Committee*,
  525 U.S. 471 (1999) ...................................................................... 30, 51

*Saavedra Bruno v. Albright*,
  197 F.3d 1153 (D.C. Cir. 1999)...................................... 20, 21, 22, 24

*Salazar v. Buono*,
  130 S. Ct. 1803 (2010) ......................................................................46

*Sale v. Haitian Ctrs. Council, Inc.*,
  509 U.S. 155 (1993) ..................................... 25, 29, 31, 39, 53

*Sessions v. Morales-Santana*,
  137 S. Ct. 1678 (2017) ....................................................................41

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 823 (1998) .........................................................................25

*Texas v. United States*,
  523 U.S. 296 (1998) .........................................................................23

*Trump v. Hawaii*,
  2017 WL 4782860 (U.S. Oct. 24, 2017) ...........................................7

*Trump v. IRAP*:
  137 S. Ct. 2080 (2017) ............................................................... 7, 56
  2017 WL 4518553 (U.S. Oct. 10, 2017) ...........................................7

*United States R.R. Ret. Bd. v. Fritz*,
  449 U.S. 166 (1980) .........................................................................41

*United States ex rel. Knauff v. Shaughnessy*,
  338 U.S. 537 (1950) ............................................. 6, 20, 24, 25, 29, 53

*United Transp. Union v. S.C. Pub. Ry. Comm'n*,
  130 F.3d 627 (4th Cir. 1997)...........................................................19

*Valley Forge Christian Coll. v. Ams. United for Separation of*
  *Church & State, Inc.*, 454 U.S. 464 (1982)................................. 27, 28

*Webster v. Doe,*
  486 U.S. 592 (1988) ........................................................................ 25, 30

*Western & S. Life Ins. Co. v. State Bd. of Equalization of Cal.,*
  451 U.S. 648 (1981) ..............................................................................41

*Yassini v. Crosland,*
  618 F.2d 1356 (9th Cir. 1980) ............................................................32

*Zelman v. Simmons-Harris,*
  536 U.S. 639 (2002) ..............................................................................48

*Zivotofsky ex rel. Zivotofsky v. Kerry,*
  135 S. Ct. 2076 (2015) ..........................................................................54


**Statutes:**

Administrative Procedure Act:
  5 U.S.C. § 701(a)(1) ..............................................................................20
  5 U.S.C. § 701(a)(2) ..............................................................................24
  5 U.S.C. § 702(1) ..................................................................................20
  5 U.S.C. § 704 ......................................................................................22

Foreign Relations Authorization Act, Fiscal Year 1979,
  Pub. L. No. 95-426, 92 Stat. 963 (1978) ............................................38

Immigration and Nationality Act:
  8 U.S.C. § 1101 *et seq.* ..........................................................................4
  8 U.S.C. § 1152(a) .......................................................................... 1, 35, 37
  8 U.S.C. § 1152(a)(1) .................................................................... 17, 36. 38
  8 U.S.C. § 1152(a)(1)(A) ............................... 15, 24, 34, 35, 37, 38, 39
  8 U.S.C. § 1152(a)(1)(B) ......................................................................39
  8 U.S.C. § 1181 ......................................................................................4
  8 U.S.C. § 1182(a)(7)(A)(i) ....................................................................4
  8 U.S.C. § 1182(a)(7)(B)(iv) ..................................................................5
  8 U.S.C. § 1182(a)(7)(B)(i)(II) ..............................................................4
  8 U.S.C. § 1182(f) ..................... 6, 10, 15, 17, 24, 25, 29, 30, 31, 32, 34, 35, 38
  8 U.S.C. § 1185(a) .......................................................... 17, 32, 34, 35
  8 U.S.C. § 1185(a)(1) ...................................... 6, 10, 17, 24, 29, 30, 31, 35, 38

8 U.S.C. § 1185(b)..........................................................................30

8 U.S.C. § 1187 ............................................................................. 5

8 U.S.C. § 1187(a)(12) ..................................................................44

8 U.S.C. § 1187(a)(12)(A)(i)-(ii)......................................................5

8 U.S.C. § 1187(a)(12)(D)(i)-(ii)......................................................5

8 U.S.C. § 1201(a)(1) ......................................................................4

8 U.S.C. § 1201(g)..........................................................................35

8 U.S.C. § 1201(i)...........................................................................20

8 U.S.C. § 1202(h)............................................................................4

8 U.S.C. § 1203 ................................................................................4

8 U.S.C. § 1204 ................................................................................4

8 U.S.C. § 1225(a)............................................................................4


6 U.S.C. § 236(f) ...........................................................................20


28 U.S.C. § 1292(a)(1) .....................................................................4


28 U.S.C. § 1331 ..............................................................................4


28 U.S.C. § 1343 ..............................................................................4

**Regulation:**

22 C.F.R. § 42.62 .............................................................................4

**Legislative Materials:**

H. Rep. No. 89-745 (1965) .............................................................36

S. Rep. No. 89-748 (1965) ..............................................................36

**Other Authorities:**

Jimmy Carter, *Sanctions Against Iran: Remarks Announcing
    U.S. Actions* (Apr. 7, 1980), http://www.presidency.ucsb.edu/
    ws/?pid=33233................................................................... 37, 38

Cent. Intelligence Agency, *The World Factbook: Africa (Chad)*,
    https://www.cia.gov/library/publications/the-world-factbook/
    geos/cd.html (last updated Oct. 26, 2017)............................................................44

Exec. Order No. 12,172, 44 Fed. Reg. 67,947 (1979)......................................31, 37

Exec. Order No. 12,807, 57 Fed. Reg. 23,133 (1992)............................................31

Exec. Order No. 13,780, 82 Fed. Reg. 13,209 (2017).......................................6, 7, 8

Proclamation No. 5517, 51 Fed. Reg. 30,470 (1986)................................32, 37, 38

Proclamation No. 5829, 53 Fed. Reg. 22,289 (1988).............................................31

Proclamation No. 5887, 53 Fed. Reg. 43,185 (1988).............................................31

Proclamation No. 6958, 61 Fed. Reg. 60,007 (1996).............................................31

Proclamation No. 8342, 74 Fed. Reg. 4093 (2009)...............................................31

Proclamation No. 8693, 76 Fed. Reg. 44,751 (2011).............................................31

Proclamation No. 9645, 82 Fed. Reg. 45,161 (2017)............. 1, 8,  9, 10, 11, 12, 32,
                                                34, 38, 40, 43, 46, 48, 49, 50

Pres. Donald J. Trump, *Speech to the Arab Islamic American Summit*
    (May     21,     2017),     https://www.whitehouse.gov/the-press-office/
    2017/05/21/president-trumps-speech-arab-islamic-american-summit................52

U.S. Dep't of Homeland Sec., *DHS Announces Further Travel Restrictions
    for the Visa Waiver Program* (Feb. 18, 2016), https://www.dhs.gov/
    news/2016/02/18/dhs-announces-further-travel-restrictions-visa-
    waiver-program ....................................................................................................5

U.S. Dep't of State, *Country Reports on Terrorism 2015* (June 2016),
    https://www.state.gov/documents/organization/258249.pdf..................................5

## INTRODUCTION

The district court enjoined worldwide a Proclamation issued by the President of the United States pursuant to his broad constitutional and statutory authority to suspend or restrict the entry of aliens abroad when he deems it in the Nation's interest. The Proclamation—"Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats," 82 Fed. Reg. 45,161 (2017)—was issued after a global review by the Department of Homeland Security, in consultation with the Department of State, of foreign governments' information-sharing practices and risk factors, culminating in a recommendation by the Acting Secretary of Homeland Security that the President restrict entry of certain nationals of eight countries that have inadequate practices or otherwise present heightened risks. The Proclamation imposes country-specific restrictions that, in the President's judgment, will most effectively "encourage cooperation" in information sharing and "protect the United States until such time as improvements occur." *Id.* at 45,164.

The district court nevertheless ruled that, despite the thorough review process and tailored substantive measures that were not present in the temporary entry suspension that preceded this one, the Proclamation is motivated by religious animus in violation of the Establishment Clause and constitutes impermissible nationality-based discrimination in the issuance of immigration visas under 8 U.S.C. § 1152(a).

That erroneous ruling threatens the ability of this and future Presidents to address national-security threats. The alleged flaws in the prior entry suspension do not apply to the Proclamation, which was issued after a worldwide, religion-neutral review by multiple Cabinet officials whose good faith has never been questioned, and which imposes only tailored restrictions on Muslim-majority as well as non-Muslim-majority nations. The district court's conclusion that this is insufficient to refute religious discrimination threatens to disable the President permanently from addressing immigration-related national-security risks in countries that pose the greatest concern. Nor does the Immigration and Nationality Act (INA) prohibit the President from imposing nationality-specific restrictions on entry to the United States, as past Presidents have also done.

All that said, this Court should not even reach the merits, because plaintiffs' claims are not justiciable in the first place. As a general matter, courts cannot review a challenge to the political branches' exclusion of aliens abroad absent express statutory authorization. Congress has not provided such authorization, and thus plaintiffs' statutory claims are barred. Although there is a limited exception to the principle of nonreviewability where the exclusion of aliens abroad allegedly violates the constitutional rights of persons in the United States, the Proclamation's alleged discrimination against certain nationals of the covered countries does not violate plaintiffs' own religious-freedom rights.

2

The district court also erred in its evaluation of the remaining factors governing preliminary injunctive relief.  The interests of the public and the government are significantly impaired by barring effectuation of a judgment of the President that restricting entry for certain nationals of eight countries is warranted to protect the Nation's safety.  By contrast, plaintiffs have not identified any cognizable and irreparable injury that they personally would incur if the restrictions on entry take effect while the case is being adjudicated, and any impact from the Proclamation on their relatives' or other identified individuals' receipt of a visa is speculative.  The preliminary injunction should be vacated for this reason as well.

At a minimum, the global injunctive relief was vastly overbroad.  Under both Article III and equitable principles, any injunction cannot properly go further than necessary to redress plaintiffs' own injuries—*i.e.*, to identified aliens whose exclusion would impose cognizable, irreparable injury on plaintiffs themselves.  The district court extended the injunction further to reach any alien with a credible claim of a bona fide relationship with a U.S. person or entity, but that standard—which the Supreme Court adopted in staying the injunction against the prior entry suspension—is not the proper standard for issuing a preliminary injunction in the first place.

## STATEMENT OF JURISDICTION

The district court's jurisdiction was invoked under 28 U.S.C. §§ 1331 and 1343.  JA 475.  This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).  The district court entered its order granting a preliminary injunction in these cases on October 17, 2017.  JA 1084.  Defendants filed timely notices of appeal on October 20, 2017.  JA 1087, 1198, 1494.  Plaintiffs in No. 17-2240 filed a timely notice of cross-appeal on October 23, 2017.  JA 1090.

## STATEMENT OF THE ISSUE

Whether the district court abused its discretion in entering a worldwide preliminary injunction barring enforcement of Section 2 of the Proclamation.

## STATEMENT OF THE CASE

### A.    Statutory Background

The Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq.*, governs admission of aliens into the United States.  Admission normally requires a valid immigrant or nonimmigrant visa.  *Id.* §§ 1181, 1182(a)(7)(A)(i), (B)(i)(II), 1203.  The visa-application process typically includes an in-person interview and results in a decision by a State Department consular officer.  *Id.* §§ 1201(a)(1), 1202(h), 1204; 22 C.F.R. § 42.62.  Although a visa is typically necessary for admission, it does not guarantee admission; the alien still must be admissible upon arriving at a port of entry.  8 U.S.C. §§ 1201(h), 1225(a).

4

Congress has created a Visa Waiver Program enabling nationals of approved countries to seek temporary admission for tourism or certain business purposes without a visa.  8 U.S.C. §§ 1182(a)(7)(B)(iv), 1187.  In 2015, Congress excluded from travel under that Program aliens who are dual nationals of or recent visitors to Iraq or Syria (where "[t]he Islamic State of Iraq and the Levant (ISIL) * * * maintain[s] a formidable force") as well as countries designated by the Secretary of State as state sponsors of terrorism (currently Iran, Sudan, and Syria).[1]  *Id.* § 1187(a)(12)(A)(i)-(ii).  Congress authorized the Department of Homeland Security (DHS) to designate additional countries of concern, considering whether a country is a "safe haven for terrorists," "whether a foreign terrorist organization has a significant presence" in the country, and "whether the presence of an alien in the country * * * increases the likelihood that the alien is a credible threat to" U.S. national security.  *Id*. § 1187(a)(12)(D)(i)-(ii).  Applying those criteria, in February 2016, DHS excluded recent visitors to Libya, Somalia, and Yemen from travel under the Program.[2]

---

[1] U.S. Dep't of State, *Country Reports on Terrorism 2015*, at 6, 299-302 (June 2016), https://www.state.gov/documents/organization/258249.pdf.

[2] U.S. Dep't of Homeland Security, *DHS Announces Further Travel Restrictions for the Visa Waiver Program* (Feb. 18, 2016), https://www.dhs.gov/news/2016/02/18/dhs-announces-further-travel-restrictions-visa-waiver-program.

In addition, building upon the President's inherent authority to exclude aliens, *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950), Congress has accorded the Executive broad discretion to suspend or restrict entry of aliens. 8 U.S.C. § 1182(f) provides:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1185(a)(1) grants the President broad general authority to adopt "reasonable rules, regulations, and orders" governing entry of aliens, "subject to such limitations and exceptions as [he] may prescribe." Pursuant to these authorities, President Reagan suspended entry of all Cuban nationals in 1986, and President Carter authorized the denial and revocation of visas for Iranian nationals in 1979. *See* pp. 31-33, 37-38, *infra*.

## B.    Executive Order No. 13,780

On March 6, 2017, the President issued Executive Order No. 13,780, 82 Fed. Reg. 13,209 (2017) (EO-2). Among other things, EO-2 directed the Secretary of Homeland Security to conduct a global review of whether foreign governments provide adequate information about their nationals seeking U.S. visas, and to report findings to the President. *See* EO-2 § 2(a), (b). The Secretary of State would then encourage countries identified as inadequate to alter their practices; following that

diplomatic-engagement process, the Secretary of Homeland Security would recommend whether and it so what entry restrictions to impose on nations that continued to have inadequate practices or to pose other risks. *See id*. § 2(d)-(f).

During that review, EO-2 temporarily suspended the entry of foreign nationals from six countries that had been identified by Congress or the Executive Branch in connection with the Visa Waiver Program as presenting heighted terrorism-related concerns. *See* EO-2 § 2(c). The district court below, and another district court, preliminarily enjoined that entry suspension, *IRAP v. Trump*, 241 F. Supp. 3d 539 (D. Md. 2017); *Hawaii v. Trump*, 245 F. Supp. 3d 1227 (D. Haw. 2017), and were affirmed in relevant part, *IRAP v. Trump*, 857 F.3d 554 (4th Cir. 2017) (en banc); *Hawaii v. Trump*, 859 F.3d 741 (9th Cir. 2017) (per curiam).

The Supreme Court granted certiorari, and partially stayed the injunctions pending review. *Trump v. IRAP*, 137 S. Ct. 2080 (2017) (per curiam). After EO-2's temporary entry suspension and certain other provisions expired, the Supreme Court vacated both injunctions as moot. *See Trump v. IRAP*, No. 16-1436, 2017 WL 4518553 (U.S. Oct. 10, 2017); *Trump v. Hawaii*, No. 16-1540, 2017 WL 4782860 (U.S. Oct. 24, 2017); *see also Camreta v. Greene*, 563 U.S. 692, 713 (2011) (point of vacatur upon mootness is "to prevent an unreviewable decision from spawning any legal consequences" and to "clear[] the path for future relitigation").

### C.    Proclamation No. 9645

On September 24, 2017, the President signed Proclamation No. 9645, 82 Fed. Reg. 45,161 (2017). The Proclamation is the product of the comprehensive review of vetting and screening procedures conducted pursuant to Section 2 of EO-2, and reflects the recommendation of the Acting Secretary of Homeland Security, and consultations with the Secretaries of State and Defense as well as the Attorney General.

**1.**    DHS, in consultation with the Department of State and the Office of the Director of National Intelligence, conducted "a worldwide review to identify whether, and if so what, additional information will be needed from each foreign country to adjudicate an application by a national of that country for a visa, admission, or other benefit under the INA * * * in order to determine that the individual is not a security or public-safety threat." EO-2 § 2(a). In a report submitted to the President on July 9, 2017, the Acting Secretary of Homeland Security developed a "baseline" for the kinds of information required, which includes three components:

> (1) identity-management information, *i.e.*, "information needed to determine whether individuals seeking benefits under the immigration laws are who they claim to be," which turns on criteria such as "whether the country issues electronic passports embedded with data to enable confirmation of identity, reports lost and stolen passports to appropriate entities, and makes available upon request identity-related information not included in its passports";

(2)  national-security and public-safety information about whether a person seeking entry poses a risk, which turns on criteria such as "whether the country makes available * * * known or suspected terrorist and criminal-history information upon request," "whether the country impedes the United States Government's receipt of information about passengers and crew traveling to the United States," and "whether the country provides passport and national-identity document exemplars"; and

(3) a national-security and public-safety risk assessment of the country, which turns on criteria such as "whether the country is a known or potential terrorist safe haven, whether it is a participant in the Visa Waiver Program * * * that meets all of [the program's] requirements, and whether it regularly fails to receive its nationals subject to final orders of removal from the United States."

Procl. § 1(c).

DHS, in coordination with the Department of State, collected data on, and evaluated, nearly 200 countries, and identified each country's information-sharing practices and risk factors.  *Id.* § 1(d).  The Acting Secretary of Homeland Security identified 16 countries as having "inadequate" information-sharing practices and risk factors, and another 31 countries as "at risk" of becoming "inadequate."  *Id.* § 1(e).

These preliminary results were submitted to the President on July 9, 2017. *Id.* § 1(c).  The Department of State conducted a 50-day engagement period with foreign governments to encourage them to improve their performance, which yielded significant gains.  *Id.* § 1(f).

**2.**  On September 15, 2017, the Acting Secretary of Homeland Security recommended that the President impose entry restrictions on certain nationals from

9

seven countries that were determined to be inadequate in their information-sharing practices or to present other risk factors:  Chad, Iran, Libya, North Korea, Syria, Venezuela, and Yemen.  *Id.* § 1(h).  The Acting Secretary also recommended entry restrictions for nationals of Somalia, which, although it was determined to satisfy baseline requirements for information-sharing, has significant identity-management deficiencies and is unable to effectively control all of its territory.  *Id*. § 1(i).

**3.**    The President evaluated the Acting Secretary's recommendation in consultation with multiple Cabinet members and other high-level government officials.  *Id.* § 1(h)(i), (ii).  The President considered a number of factors, including each country's "capacity, ability, and willingness to cooperate with our identity-management and information-sharing policies and each country's risk factors," as well as "foreign policy, national security, and counterterrorism goals."  *Id.* § 1(h)(i).

Acting in accordance with the Acting Secretary's recommendation, the President exercised his constitutional authority and his statutory authority under 8 U.S.C. §§ 1182(f) and 1185(a)(1) to impose tailored entry restrictions on certain nationals from eight countries.  The restrictions were intended "to encourage cooperation given each country's distinct circumstances, and * * *, at the same time, protect the United States until such time as improvements occur."  *Id*. § 1(h)(i).  The President determined that these entry restrictions are "necessary to prevent the entry of those foreign nationals about whom the United States Government lacks sufficient

information to assess the risks they pose to the United States," and which are "needed to elicit improved identity-management and information-sharing protocols and practices from foreign governments." *Ibid.*

For countries that refuse to cooperate regularly with the United States (Iran, North Korea, and Syria), the Proclamation suspends entry of all nationals, except for Iranian nationals seeking nonimmigrant student (F and M) and exchange-visitor (J) visas. Procl. § 2(b)(ii), (d)(ii), (e)(ii). For countries that are valuable counter-terrorism partners but have information-sharing deficiencies (Chad, Libya, and Yemen), the Proclamation suspends entry only of nationals seeking immigrant visas and nonimmigrant business, tourist, and business/tourist (B-1, B-2, B-1/B-2) visas. *Id.* § 2(a)(ii), (c)(ii), (g)(ii). For Somalia, which has significant identity-management deficiencies and is unable to effectively control all of its territory, the Proclamation suspends entry of nationals seeking immigrant visas and requires additional scrutiny of nationals seeking nonimmigrant visas. *Id.* § 2(h)(ii). And for Venezuela, which refuses to cooperate in information-sharing but for which alternative means of obtaining identity information are available, the Proclamation suspends entry of government officials "involved in screening and vetting procedures," and "their immediate family members," on nonimmigrant business or tourist visas. *Id.* § 2(f)(ii).

11

The Proclamation provides for case-by-case waivers where a foreign national demonstrates that denying entry would cause undue hardship, entry would not pose a threat to the national security or public safety, and entry would be in the national interest. *Id.* § 3(c)(i)(A)-(C). The Proclamation requires an ongoing review of the Proclamation's restrictions, taking into account whether countries have improved their identity-management and information-sharing protocols, and periodic reporting to the President about whether entry restrictions should be continued, modified, terminated, or supplemented. *Id.* § 4.

The Proclamation took effect immediately for all foreign nationals who were subject to entry restrictions under Section 2(a) of EO-2 pursuant to the Supreme Court's partial stay of the injunctions barring enforcement of that provision, and was to take effect on October 18, 2017, for all other persons subject to the Proclamation. *Id.* § 7.

**D.     District Court Injunction**

**1.**     These three cases are brought by individual and organizational plaintiffs who challenge the Proclamation under the INA as well as the Establishment Clause and the Equal Protection Clause.

The individual plaintiffs include U.S. citizens and lawful permanent residents (LPRs) who have relatives from Iran, Syria, Yemen, and Somalia seeking immigrant

12

or nonimmigrant visas, as well as a few LPRs who do not have relatives seeking entry from one of the covered countries.  JA 1013-14.

Organizational plaintiffs include the International Refugee Assistance Project (IRAP), and HIAS, Inc., both of which provide services to refugees in the resettlement process; the Arab American Association of New York (AAANY), which provides legal and other services to the Arab-American and Arab immigrant community; The Middle East Studies Association of North America (MESA), an organization of graduate students and faculty focused on Middle Eastern studies; the Yemeni-American Merchants Association (YAMA), a membership organization that protects against harassment and assists with immigration issues; Iranian Alliances Across Borders (IAAB), which organizes youth camps, educational events, and international conferences for the Iranian diaspora; and the Iranian Students' Foundation (ISF), which organizes events for Iranian-American students. JA 1014.

**2.**    After expedited briefing and argument, the district court entered a worldwide preliminary injunction barring enforcement of Section 2 of the Proclamation against any alien with a credible claim of a bona fide relationship to a U.S. person or entity, except nationals of Venezuela and North Korea.  JA 1079-81.

The court held that U.S. residents may challenge the exclusion of aliens abroad where they have a specific interest in the entry of those aliens.  JA 1016-17.

13

The court reasoned that exclusion orders are nonreviewable only where they involve "individual visa decisions by consular officers," rather than "a broader policy." JA 1029.

The court further held that several individual plaintiffs have standing to assert their claims that the entry restrictions in Section 2 of the Proclamation violate the INA. The court reasoned that the entry restrictions harm individual plaintiffs by threatening to prolong their separation from family members from the designated countries seeking visas to come to the United States. JA 1017-18. The district court reasoned that several organizational plaintiffs have standing either on behalf of their members for similar reasons, JA 1022, or in their own right because foreign nationals subject to the entry restrictions will be unable to attend sponsored conferences and events, JA 1019-20. The court further concluded that the individuals whose family members are subject to the Proclamation have standing to challenge the entry restrictions under the Establishment Clause because of their alleged "personal contact" with those restrictions and the intangible "feelings of marginalization or emotional distress [they experience] as a result of the Proclamation's alleged anti-Muslim message." JA 1024-27.

**3.**    The court found that plaintiffs were likely to succeed on the merits as to some of their statutory and constitutional claims.

14

Although the court held that plaintiffs had failed to show they are likely to succeed on their claim that the Proclamation exceeds the President's authority to suspend the entry of aliens under 8 U.S.C. § 1182(f), JA 1041-53, it held that plaintiffs are likely to succeed on their claim that the Proclamation violates the INA's prohibition on nationality-based discrimination in the issuance of immigrant visas, 8 U.S.C. § 1152(a)(1)(A), JA 1034-40. The court reasoned that the Proclamation's entry restrictions are "the equivalent of a ban on issuing immigrant visas based on nationality." JA 1038. The court acknowledged that "[t]here may be scenarios under which denial of entry based on nationality" would be permissible, "such as during a specific urgent national crisis or public health emergency," JA 1037, but it distinguished the Proclamation on the ground that it "imposed a permanent * * * ban on immigrants from the Designated Countries," JA 1038.

The court also held that plaintiffs are likely to succeed on the merits of their Establishment Clause claim. JA 1053-76. It agreed with the Government that the Proclamation should be reviewed under the "facially legitimate and bona fide reason" standard in *Kleindienst v. Mandel*, 408 U.S. 753 (1972), and that the Proclamation's national-security interest is facially legitimate. JA 1055. The court found, however, that the plaintiffs had "plausibly allege[d]" that the stated rationale for the Proclamation was not bona fide, which the court held entitled it to look behind the Proclamation's stated rationale. JA 1056-57. Doing so, the court concluded that

15

the Proclamation "stands in the[] shadow" of EO-2, which the court had previously concluded was likely to violate the Establishment Clause, JA 1064, and that the Proclamation did not constitute "curative action" that would remove the "taint" the court perceived, JA 1064, 1067.

The court concluded that the balancing of harms supports an injunction. JA 1076-77. Although the court acknowledged that "no government interest is more compelling than the security of the Nation," JA 1078, the court was of the view that the Proclamation was not necessary to ensure national security, *ibid.*, and that those interests "are not paramount in this instance," JA 1079.

## SUMMARY OF ARGUMENT

**I.** The district court erred in holding that plaintiffs' claims are justiciable. It is a fundamental separation-of-powers principle that the political branches' decisions to exclude aliens abroad generally are not judicially reviewable absent express authorization by law. That principle bars review of plaintiffs' statutory claims, which in any event are not cognizable under the Administrative Procedure Act (APA) and Article III ripeness requirements. Although the Supreme Court has allowed limited judicial review when a U.S. citizen claims that the exclusion of an alien abroad infringes the plaintiff's own constitutional rights, plaintiffs here assert no cognizable violation of their own Establishment Clause rights.

16

**II.**   The district court also erred in holding that plaintiffs are likely to succeed on the merits of their claims.

Plaintiffs' statutory claims fail because the entry restrictions imposed by the Proclamation fall well within the President's broad, discretionary authority under 8 U.S.C. §§ 1182(f) and 1185(a)(1).   The Proclamation contains ample findings that the identified countries have inadequate information-sharing practices or other risk factors, and that the entry restrictions encourage those countries to improve and protect this country from those risks in the interim.   Past Presidents have similarly invoked this statutory authority to impose nationality-based bans on the entry of nationals from countries that pose national-security and foreign-policy concerns.

Imposing nationality-based bans on entry does not contravene 8 U.S.C. § 1152(a)(1)'s prohibition on nationality-based discrimination in the issuance of an immigrant visa.   Section 1152(a)(1) applies to immigrants who are otherwise eligible for a visa, but does not abrogate the President's authority under Sections 1182(f) and 1185(a) to limit eligibility in the first place.   The statutory provisions can, and should, be harmonized.

The Proclamation is also consistent with the Establishment Clause.   The Proclamation's entry restrictions are justified by facially legitimate and bona fide reasons.   The district court's second-guessing of the President's subjective

17

motivation is inconsistent with *Mandel* and subsequent precedent, and fails to give due regard to the President's national-security judgment.

Furthermore, even under domestic Establishment Clause precedent, the Proclamation is clearly lawful. It is religion-neutral on its face and in operation, and its tailored restrictions, which apply to both Muslim-majority and non-Muslim-majority nations, are animated by country-specific conditions identified after a comprehensive review by multiple Cabinet officials, not by religious animus. In light of the current Proclamation's valid process and substance, it cannot be invalidated simply based on some perceived historical taint from the prior entry suspensions or earlier campaign statements.

**III.**    Finally, the district court erred in concluding that the balancing of harms supports its injunction. The injunction causes irreparable harm by overriding the President's national-security judgment. Plaintiffs have not identified any cognizable and irreparable injury that they personally would incur, and any effect on the receipt of visas by their relatives or other identified individuals is speculative. In any event, the injunction was overbroad under Article III and equitable principles, because it extended beyond plaintiffs' own alleged injuries to reach aliens who have relationships only with unidentified non-parties in this country.

**STANDARD OF REVIEW**

This Court "review[s] the grant of a preliminary injunction for abuse of discretion." *United Transp. Union v. S.C. Pub. Ry. Comm'n*, 130 F.3d 627, 631 (4th Cir. 1997). "A district court abuses its discretion when it misapprehends or misapplies the applicable law." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 235 (4th Cir. 2014). "[T]he court will vacate an injunction if it is broader in scope than that necessary to provide complete relief to the plaintiff or if an injunction does not carefully address only the circumstances of the case." *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 128 (4th Cir. 2011).

**ARGUMENT**

As demonstrated below, the Government is likely to prevail on the merits, both because plaintiffs' claims are not justiciable and because plaintiffs are unlikely to prevail under the statutory and constitutional provisions they invoke.

## I.   Plaintiffs' Claims Are Not Justiciable

### A.   Plaintiffs' Statutory Claims Are Not Justiciable

**1.**   The Supreme Court "ha[s] long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977). "[I]t is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the

19

Government to exclude a given alien." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950).

Courts have distilled from this deeply rooted principle of nonreviewability the rule that the denial or revocation of a visa for an alien abroad "is not subject to judicial review * * * unless Congress says otherwise." *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1159 (D.C. Cir. 1999). Congress has not provided for judicial review of decisions to exclude aliens abroad, *e.g.*, 6 U.S.C. § 236(f), and has forbidden "judicial review" of visa revocations (subject to a narrow exception inapplicable to aliens abroad), 8 U.S.C. § 1201(i). Accordingly, the longstanding bar on judicial review of the political branches' exclusion of aliens abroad forecloses plaintiffs' statutory challenges to the Proclamation.

Moreover, history "unmistakabl[y]" confirms that "the immigration laws 'preclude judicial review' of consular visa decisions." *Saavedra Bruno*, 197 F.3d at 1160. The lone time the Supreme Court held that certain aliens (only those physically present in the United States) could seek review of exclusion orders under the APA, Congress abrogated the ruling and limited those aliens to the habeas remedy (which is not available to aliens abroad). *See id.* at 1157-62. Because even an alien present in the United States cannot invoke the APA to obtain review, *a fortiori* neither can aliens abroad nor U.S. citizens acting at their behest. *See* 5 U.S.C. §§ 701(a)(1), 702(1).

20

The district court held that the principle of nonreviewability of the exclusion of aliens applies only to a challenge to "individual visa decisions by consular officers," not to a Presidential proclamation restricting entry of nationals from eight countries. JA 1029. Although the nonreviewability principle is applied most frequently to decisions by consular officers adjudicating visa applications, it would invert the constitutional structure to limit review in that context while permitting review of the President's decision to restrict entry of classes of aliens. A consular officer is a subordinate executive-branch official under the constitutional hierarchy. Consular nonreviewability is grounded in the "firmly-established principle" that the power to exclude aliens is "inherent in sovereignty, necessary for maintaining normal international relations and defending the country," and "to be exercised exclusively by the political branches of government." *Saavedra Bruno*, 197 F.3d at 1158-59. Those considerations apply even more strongly to broader national-security judgments of the President than to individualized decisions by a consular official. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 584-91 (1952) (relying on these considerations in rejecting broad challenges to immigration statute).

This Court's since-vacated opinion addressing EO-2 does not support the district court's rationale, because it rested solely on the constitutional claims and did not address whether the statutory claims were reviewable. *IRAP*, 857 F.3d at 579-80. The district court relied instead on *Abourezk v. Reagan*, 785 F.2d 1043 (D.C.

21

Cir. 1986), *aff'd by an equally divided Court*, 484 U.S. 1 (1987), in which the D.C. Circuit concluded that U.S. citizens who invited foreign nationals to speak were aggrieved by the State Department's interpretation of an INA definition that led to the exclusion of the intended speakers. JA 1017. As the D.C. Circuit subsequently recognized in *Saavedra Bruno*, however, *Abourezk* "rested in large measure" on an INA provision that was subsequently amended to "make[] clear that district courts do not have general jurisdiction over claims arising under the immigration laws and that their jurisdiction extends only to actions brought by the government." 197 F.3d at 1164.[3]

2.    Even if the general rule of nonreviewability did not foreclose judicial review of plaintiffs' statutory claims, review would still be unavailable for three additional reasons.

*First*, the APA provides for judicial review only of "final agency action." 5 U.S.C. § 704. The President's Proclamation is not "agency action" at all, *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992), and there also has been no "final" agency decision denying a visa based on the Proclamation to any of the aliens abroad identified by plaintiffs. Even in cases where courts have considered *constitutional*

---

[3] The district court also relied on *Legal Assistance for Vietnamese Asylum Seekers v. Department of State* (*LAVAS*), 45 F.3d 469 (D.C. Cir. 1995), *vacated on other grounds*, 519 U.S. 1 (1996), and *International Union of Bricklayers v. Meese*, 761 F.2d 798, 801 (D.C. Cir. 1985), JA 1017, 1030, but neither case even involved, let alone sustained, a challenge to orders excluding aliens abroad.

claims of U.S. plaintiffs challenging the exclusion of aliens abroad, *see* pp. 25-26, *infra*, they have not done so *until after* the aliens had been denied visas.

Indeed, for this reason, plaintiffs' statutory claims as well as their constitutional claims do not satisfy Article III and equitable ripeness requirements. If any alien in whose entry a U.S. plaintiff has a cognizable interest is found otherwise eligible for a visa and denied a waiver, then that plaintiff can bring suit at that time (if the plaintiff's claim is otherwise justiciable) and the Court can consider the challenge in a concrete dispute. *See Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'").

The district court reasoned that the waiver process "itself presents an additional hurdle not faced by other visa applicants which would delay reunification." JA 1028. But it is not at all clear that the process of seeking a waiver would cause any meaningful delay of the definitive resolution of an application for a visa. Visa times vary widely, and it is not unusual for an alien to wait months or years from the time he applies for an immigrant visa before receiving one. Nor is the waiver process a discriminatory "hurdle" like the law challenged in *Jackson v. Okaloosa Cty.*, 21 F.3d 1531, 1541 (11th Cir. 1994), because it applies only to aliens who lack any constitutional rights concerning entry, *Knauff*, 338 U.S. at 542, not to the plaintiffs themselves.

23

*Second*, plaintiffs lack a statutory right to enforce. Nothing in the INA gives plaintiffs a direct right to judicial review, and the APA's "general cause of action" exists only for "persons 'adversely affected or aggrieved by agency action within the meaning of a relevant statute,'" *Block v. Community Nutrition Inst.*, 467 U.S. 340, 345 (1984). The statutory provisions empowering the President to restrict entry of aliens, 8 U.S.C. §§ 1182(f), 1185(a)(1), and prohibiting nationality-based discrimination in the issuance of immigrant visas, *id.* § 1152(a)(1)(A), do not confer any legally cognizable rights on third parties like plaintiffs here—*i.e.*, U.S. persons or organizations seeking entry of aliens abroad.

Although the district court invoked *Abourezk* and the vacated decision in *LAVAS*, JA 1030, the D.C. Circuit has since held that, even when the INA permits a U.S. person to file a petition for a foreign family member's classification as a relative for immigrant status, any arguable interest the U.S. person has "terminate[s]" "[w]hen [his] petition [i]s granted." *Saavedra Bruno*, 197 F.3d at 1164. Likewise, the INA does not protect any interest of organizations that merely provide services to aliens seeking entry. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990).

*Third*, the APA does not apply to the extent "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Here, the relevant statutes give the President unreviewable discretion to impose restrictions on entry. *See* pp. 29-30, *infra*. The district court rejected this argument on the ground that "courts have had

24

no difficulty reaching the merits of challenges to the President's use of § 1182(f)," JA 1031, relying principally on *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993). But the Supreme Court in *Sale* did not question the President's national security judgment under 8 U.S.C. § 1182(f) and did not address whether plaintiffs' claims were reviewable because it rejected them on the merits. *Sale*, 509 U.S. at 170-88; *cf. Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998) ("drive-by jurisdictional rulings * * * have no precedential effect").

### B.    Plaintiffs' Establishment Clause Claims Are Not Justiciable

**1.**    Although Congress has not expressly authorized judicial review of Executive decisions to exclude aliens abroad, it has not "clear[ly]" "preclude[d] judicial review" for persons asserting violations of their own constitutional rights. *Webster v. Doe*, 486 U.S. 592, 603 (1988). The exclusion of aliens typically raises no constitutional questions because aliens abroad lack any constitutional rights regarding entry. *Knauff*, 338 U.S. at 542. However, the Supreme Court has twice engaged in limited judicial review when a U.S. citizen contended that the denial of a visa to an alien abroad violated the citizen's own constitutional rights. *Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972) (reviewing but rejecting claim that the denial of a waiver of visa-ineligibility to a Belgian national violated U.S. citizens' own First Amendment right to receive information); *Kerry v. Din*, 135 S. Ct. 2128 (2015)

(reviewing but rejecting claim by a U.S. citizen that the refusal of a visa to her husband violated her own alleged due-process rights concerning her spouse's entry).

*Mandel* and *Din* are inapposite here. Even putting aside that plaintiffs have identified no visa application that has yet been denied based on the Proclamation, their claimed injury from the exclusion of aliens abroad is not cognizable because it does not stem from an alleged infringement of plaintiffs' own constitutional rights to religious freedom.

In *McGowan v. Maryland*, 366 U.S. 420 (1961), the Supreme Court held that individuals who are indirectly injured by alleged religious discrimination against others generally may not sue, because they have not suffered violations of their own rights. *Id.* at 429-30. The plaintiffs, employees of a store subject to a Sunday-closing law, lacked standing to challenge the law on free-exercise grounds because they "d[id] not allege any infringement of their own religious freedoms," *id.* at 429, and had standing to bring an Establishment Clause challenge *only* because they suffered "direct * * * injury, allegedly due to the [law's] imposition on them of the tenets of the Christian religion," *id.* at 430-31.

Here, by contrast, plaintiffs are not directly subject to the Proclamation, and thus are not asserting violations of their own constitutional rights. They instead allege indirect injuries from the Proclamation's application to others—the individual plaintiffs' family members and the organizational plaintiffs' clients—who

26

themselves have no constitutional rights. In reaching the contrary conclusion, JA 1024, the district court erroneously conflated the question whether an individual has suffered *an injury-in-fact* from an alleged Establishment Clause violation with the question whether the violation was of the individual's *own Establishment Clause rights*.

**2.** Plaintiffs also asserted that they have "experienced feelings of marginalization or emotional distress as a result of the Proclamation's alleged anti-Muslim message." JA 1026-27. This "message" injury likewise is not cognizable; the Supreme Court has "ma[de] clear" that "the stigmatizing injury often caused by racial [or other invidious] discrimination * * * accords a basis for standing only to 'those persons who are personally denied equal treatment' by the challenged discriminatory conduct." *Allen v. Wright*, 468 U.S. 737, 755 (1984). The same rule applies to Establishment Clause claims. *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 485-86 (1982).

To be sure, a plaintiff may suffer a cognizable injury where he himself has been "subjected to unwelcome religious exercises" or "forced to assume special burdens to avoid them." *Id.* at 486 n.22. But the Proclamation says nothing about religion and does not subject plaintiffs to any religious exercise, and the D.C. Circuit correctly has rejected the notion that a putative Establishment Clause plaintiff may "re-characterize[]" an abstract injury flowing from "government *action*" directed

27

against others as a personal injury from "a governmental *message* [concerning] religion" directed at the plaintiff. *In re Navy Chaplaincy*, 534 F.3d 756, 764 (2008) (Kavanaugh, J.), *cert. denied*, 556 U.S. 1167 (2009). Permitting that approach would "eviscerate well-settled standing limitations" in cases like *Valley Forge* that involve challenges to government actions concerning third parties on the grounds that they endorse or disfavor religion. *Id*.

Indeed, the district court, like this Court in its since-vacated opinion addressing EO-2, acknowledged that plaintiffs could not challenge the Proclamation based solely on the Proclamation's alleged message, absent "personal contact" with the Proclamation. JA 1024; *see also IRAP*, 857 F.3d at 582-83. But, as already discussed, plaintiffs do not have "personal contact" with the Proclamation since it does not apply to them at all, but only to third-party aliens abroad. In sum, Plaintiffs' alleged third-party injuries are insufficient to invoke the limited review for first-party constitutional claims afforded in *Mandel* and *Din*.

## II.    Plaintiffs Do Not Have A Likelihood Of Success On The Merits Of Their Statutory or Constitutional Claims

The government is also likely to prevail on the merits of its appeal because the district court erred in holding that the Proclamation's entry restrictions likely contravene the INA and the Establishment Clause.

28

**A.    The Proclamation Is Consistent With The INA**

**1.    The President Has Extremely Broad Discretion To Suspend Entry Of Aliens Abroad**

**a.**    The President's Proclamation was issued pursuant to his inherent Article II authority to exclude aliens, *see Knauff*, 338 U.S. at 543, and his broad statutory authority under 8 U.S.C. §§ 1182(f) and 1185(a)(1).

Section 1182(f) provides that "[w]henever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate." As courts have repeatedly recognized, Section 1182(f) provides the President "sweeping" discretionary power to suspend the entry of aliens. *Abourezk*, 785 F.2d at 1049 n.2; *see also, e.g., Allende v. Shultz*, 845 F.2d 1111, 1118-19 (1st Cir. 1988). The Supreme Court has deemed it "perfectly clear that [Section] 1182(f) * * * grants the President ample power to establish a naval blockade that would simply deny illegal Haitian migrants the ability to disembark on our shores." *Sale*, 509 U.S. at 187.

Section 1185(a)(1) similarly authorizes the President to restrict the entry of aliens into the United States, or to set "such reasonable rules, regulations, and orders," and "such limitations and exceptions as the President may prescribe." This

29

statutory text likewise confirms the breadth of the President's authority; the text does not require any predicate findings, but simply gives the President the authority to restrict entry to the United States according to "such limitations and exceptions as the President may prescribe."  *Id.; see Allende*, 845 F.2d at 1118 & n.13; *Haig v. Agee*, 453 U.S. 280, 297 (1981) (construing similar language in § 1185(b) as "le[aving] the power to make exceptions exclusively in the hands of the Executive").

The plain terms of Sections 1182(f) and 1185(a)(1) provide no basis for judicial second-guessing of the President's determination about what restrictions to "prescribe" or what restrictions are necessary to avoid "detriment[] to the interests of the United States."  In these circumstances, where Congress has traditionally and expressly committed these matters to the President's judgment and discretion, there are no meaningful standards for review.  *See Doe*, 486 U.S. at 600-01; *Dalton v. Specter*, 511 U.S. 462, 474-76 (1994).  As the Supreme Court recognized in *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 491 (1999) (*AAADC*), courts are "ill equipped to determine the[] authenticity and utterly unable to assess the[] adequacy" of the Executive's reasons for excluding particular foreign nationals.  At a minimum, to the extent Section 1182(f) envisions any "find[ings]," the fact that the President acts by "proclamation" suggests that they need not be extensive and should not be subject to searching review.

30

**b.** Historical practice confirms the breadth of, and deference owed to, the President's exercise of authority under Sections 1182(f) and 1185(a)(1). For decades, Presidents have restricted entry pursuant to those statutes without detailed public justifications or findings; some have discussed the President's rationale in one or two sentences that broadly declare the Nation's interests.[4] The only justification provided for the Presidential action at issue in *Sale*, for example, was that "[t]here continues to be a serious problem of persons attempting to come to the United States by sea without necessary documentation and otherwise illegally." Executive Order No. 12,807, pmbl. pt. 4, 57 Fed. Reg. 23,133 (1992). The Supreme Court expressed no concerns about the adequacy of that finding, ruling that "[w]hether the President's chosen method" made sense from a policy perspective was "irrelevant to the scope of his authority" under Section 1182(f). *Sale*, 509 U.S. at 187-88.

Similarly, in 1979, when President Carter invoked Section 1185(a)(1) in response to the Iranian hostage crisis, he made no express findings and delegated to lower Executive Branch officials the authority to deny and revoke visas for Iranian nationals. *See* Exec. Order No. 12,172, § 1-101, 44 Fed. Reg. 67,947 (1979). Courts had no trouble upholding those restrictions. *E.g.*, *Malek-Marzban v. INS*, 653 F.2d

---

[4] *E.g.*, Proclamation No. 8693, 76 Fed. Reg. 44,751 (2011); Proclamation No. 8342, 74 Fed. Reg. 4093 (2009); Proclamation No. 6958, 61 Fed. Reg. 60,007 (1996); Proclamation No. 5887, 53 Fed. Reg. 43,185 (1988); Proclamation No. 5829, 53 Fed. Reg. 22,289 (1988).

113, 116 (4th Cir. 1981); *Yassini v. Crosland*, 618 F.2d 1356, 1362 (9th Cir. 1980); *Nademi v. INS*, 679 F.2d 811, 813-14 (10th Cir. 1982). And when President Reagan suspended the entry of Cuba nationals as immigrants in 1986 pursuant to 8 U.S.C. § 1182(f), he offered only a single sentence explaining the basis for his action. *See* Proclamation No. 5517, 51 Fed. Reg. 30,470 (1986).

### 2.    The Proclamation Is Fully Justified By The President's National Security And Foreign Affairs Judgments

Here, the Presidential findings and explanation set forth in the Proclamation amply support the exercise of his authority to impose entry restrictions under Sections 1182(f) and 1185(a). The President imposed the entry restrictions after reviewing the recommendations of the Acting Secretary of Homeland Security, following a worldwide review that evaluated every country according to established criteria. The Acting Secretary recommended entry restrictions on eight countries, each of which was identified as "inadequate" in its information-sharing practices or as presenting other special circumstances. *See* Procl. § 1(c)-(g), (i). The entry restrictions for each country are tailored to the country's particular circumstances and conditions. *See id.* §§ 1(h)(i), 2(a)-(h).

The President found that the "entry into the United States of persons described in Section 2 of [the] proclamation would be detrimental to the interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions." *Id.* pmbl. As the President explained, the entry restrictions serve two

32

purposes. First, they "prevent the entry of those foreign nationals about whom the United States Government lacks sufficient information to assess the risks they pose to the United States." Procl. § 1(h)(i); *id.* § 1(a), (b) (discussing the importance of foreign governments' information-sharing to vetting process). Plaintiffs have offered no basis to second-guess this national-security judgment. *Cf. Department of Navy v. Egan*, 484 U.S. 518, 530 (1988). Second, the entry restrictions are "needed to elicit improved identity-management and information-sharing protocols and practices from foreign governments" whose nationals are subject to the restrictions. Procl. § 1(h)(i). The diplomatic-engagement period described in the Proclamation yielded significant improvements in foreign governments' information sharing, *id.* § 1(e)-(g), and encouraging changes in the behavior of foreign governments through entry restrictions is an accepted foreign-policy method, as illustrated by President Carter's Iranian order and President Reagan's Cuban order. *See* pp. 37-38, *supra*.

Furthermore, both of these purposes are furthered by nationality-based entry restrictions. Foreign governments "manage the identity and travel documents of their nationals" and "control the circumstances under which they provide information about their nationals to other governments." *Id.* § 1(b). Because the Proclamation's entry restrictions seek both to protect against and to encourage improvement of deficient information-sharing practices by certain foreign countries, it is eminently sensible to impose those restrictions on nationals of those countries

33

traveling on those countries' passports (and, conversely, not to apply them to dual nationals of a covered country who are traveling on a non-covered country's passport, *id.* § 3(b)(iv)).

### 3. Section 1152(a)(1)'s Prohibition On Nationality Discrimination In  Issuing Immigrant Visas Does Not Restrict The President's Authority To Suspend Entry

Although the district court rejected plaintiffs' argument that the Proclamation exceeded the President's authority under Sections 1182(f) or 1185(a), JA 1041-53, it held that the Proclamation's targeted entry restrictions violate 8 U.S.C. § 1152(a)(1)(A), which prohibits discrimination on the basis of nationality in the "issuance of [an] immigrant visa[]," JA 1034-40.  The court erred in reading Section 1152(a) to override the President's distinct authority under Sections 1182(f) and 1185(a), especially in light of the statutory deference afforded to the President, contrary historical practice, and the serious constitutional concerns raised by that interpretation.

a.      It is axiomatic that "when two statutes are capable of co-existence, it is the duty of the courts * * * to regard each as effective." *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155 (1976).  That principle applies here. As the district court itself previously (and correctly) recognized, "barring *entry* to the United States based on nationality pursuant to the President's authority under § 1182(f) does not appear to run afoul of the provision in § 1152(a) barring discrimination *in the issuance of*

34

*immigrant visas*." *IRAP*, 241 F. Supp. 3d at 554 (emphasis added). At an absolute minimum, Section 1152(a)(1)(A) by its plain terms does not prohibit the President from restricting entry based on nationality under Sections 1182(f) and 1185(a), even if it were to require the State Department to issue immigrant visas to aliens whose entry the President has suspended based on nationality. Moreover, Section 1152(a) does not even require issuing immigrant visas to aliens whose entry has been validly suspended based on nationality under Sections 1182(f) and 1185(a). The two sets of statutory provisions simply operate in different spheres: Sections 1182(f) and 1185(a), like numerous other provisions of the INA, limit the universe of individuals eligible to receive visas; Section 1152(a)(1)(A), by contrast, prohibits discrimination on the basis of nationality within that universe of eligible individuals. Indeed, the INA expressly requires the denial of visas to aliens who are ineligible "under section 1182." 8 U.S.C. § 1201(g).[5]

Legislative history confirms that Congress understood the INA to operate in this manner. The 1965 amendment enacting the provision codified at 8 U.S.C. § 1152(a)(1)(A) was designed to eliminate the country-quota system previously in

---

[5] The district court thus erred both in relying on consular officers' role in implementing the Proclamation through visa denials, JA 1039, and in finding it "highly significant that § 1152(a) explicitly excludes certain sections of the INA from its scope * * * but * * * not § 1182(f) or § 1185(a)," JA 1036. Section 1152(a)(1)(A) applies only to those who are eligible for entry to the United States, which necessarily excludes individuals whom the President determines are ineligible for entry, and thus for visas, under Sections 1182(f) or 1185(a)(1).

effect, but it was intended to operate only as to those aliens *otherwise eligible for visas*, not to modify the eligibility criteria for admission or to limit pre-existing provisions like Sections 1182(f) or 1185(a)(1) addressing entry. *See* H. Rep. No. 89-745, at 12 (1965) ("Under this [new] system, selection *from among those eligible to be immigrants* * * * will be based upon the existence of a close family relationship to U.S. citizens or permanent resident aliens and not on the existing basis of birthplace or ancestry." (emphasis added)); S. Rep. No. 89-748, at 13 (1965) (similar).

Moreover, harmonizing the statutes is particularly appropriate where the President is imposing restrictions on the entry of aliens to influence foreign governments' behavior. As the Ninth Circuit acknowledged in *Hawaii*, the President may permissibly distinguish among "classes of aliens on the basis of nationality" when warranted "as retaliatory diplomatic measures responsive to government conduct directed at the United States." 859 F.3d at 772 n.13. This Court has upheld nationality-based restrictions challenged on constitutional and statutory grounds, *see Malek-Marzban*, 653 F.2d at 116, and construing Section 1152(a)(1) to disable the President from taking action against the nationals of a foreign state for foreign affairs or national-security reasons (*e.g.*, when on the brink of war with a country) would of course raise serious constitutional concerns.

36

Historical practice also strongly supports the government's interpretation of the relevant provisions. In 1986, President Reagan suspended the immigrant entry of "all Cuban nationals," subject to certain exceptions, until "the Secretary of State, after consultation with the Attorney General, determines that normal migration procedures with Cuba have been restored." 51 Fed. Reg. at 30,470-71. President Carter issued an order in 1979 in response to the Iranian hostage crisis; although the order did not itself deny or revoke visas, the President explained upon its issuance that the State Department would "invalidate all visas issued to Iranian citizens" and would not reissue visas or issue new visas "except for compelling and proven humanitarian reasons or where the national interest of our own country requires." Jimmy Carter, *Sanctions Against Iran: Remarks Announcing U.S. Actions* (Apr. 7, 1980), http://www.presidency.ucsb.edu/ws/?pid=33233 ("*Sanctions Against Iran*"); *see also* 44 Fed. Reg. 67,947 (1979). Construing Section 1152(a)(1)(A) to forbid nationality-based restrictions on entry would mean that those measures were unlawful.

The district court distinguished these prior Presidential actions, as well as the brink-of-war scenario, on the ground that they were of "limited duration, such as during a specific urgent national crisis or public health emergency." JA 1037. But that distinction has no textual basis in Section 1152(a). Nor is it supported by the underlying facts; if anything, the prior suspensions were more indefinite in scope

than the Proclamation. President Reagan's suspension of entry of Cuban immigrants was to "remain in effect until such time as the Secretary of State, after consultation with the Attorney General, determines that normal migration procedures with Cuba have been restored." 51 Fed. Reg. at 30,471. And President Carter's instruction to the State Department was to "invalidate all visas issued to Iranian citizens" and not to reissue visas or issue new visas "except for compelling and proven humanitarian reasons or where the national interest of our own country requires." *Sanctions Against Iran, supra*. The Proclamation, by contrast, requires periodic review of the continuing need for the restrictions and establishes a process for recommending that they be terminated or modified. Procl. § 4.

**b.** Even assuming that Section 1152(a)(1)(A) were inconsistent with Sections 1182(f) and 1185(a)(1), background principles of construction would require finding that Section 1152(a)(1) gives way. Section 1185(a)(1) was amended to its current form in 1978, after enactment of Section 1152(a)(1)(A), and as the most recent statute, would prevail. *See* Foreign Relations Authorization Act, Fiscal Year 1979, Pub. L. No. 95-426, § 707(a), 92 Stat. 963, 992-93 (1978). Furthermore, while Section 1152(a)(1)(A) establishes a general rule governing nondiscrimination in the issuance of visas by consular officers and others involved in that process, Sections 1182(f) and 1185(a)(1) constitute more specific, and thus controlling, grants of authority expressly and directly to the *President* to restrict entry of aliens to protect

38

the national interest.  *See Sale*, 509 U.S. at 170-73; *see also NLRB v. SW General, Inc.*, 137 S. Ct. 929, 941 (2017).

Finally, even if the district court were correct that Section 1152(a)(1)(A) would otherwise forbid withholding immigrant visas from aliens whose entry was suspended, Section 1152(a)(1)(B) confirms that Section 1152(a)(1)(A) does not "limit the authority of the Secretary of State to determine the procedures for the processing of immigrant visa applications."  The means by which the Secretary of State implements the Proclamation's entry restrictions—*i.e.,* by withholding visas from aliens who are not eligible for entry—constitutes a "procedure[]" within the meaning of Section 1152(a)(1)(B).

## B.  The Proclamation Is Consistent With The Establishment Clause

The district court also erred in holding that the Proclamation's entry restrictions likely violate the Establishment Clause.  The Proclamation is constitutional regardless of whether the Court applies *Mandel*'s limited standard of review that there need only be a "facially legitimate and bona fide reason" for excluding aliens abroad, 408 U.S. at 770, or the primary "secular purpose" standard applied in the domestic context in certain circumstances, *e.g., McCreary County v. ACLU of Kentucky*, 545 U.S. 844, 862 (2005).

1.    **The Proclamation Is Constitutional Under** *Mandel* **Because It Relies On Facially Legitimate And Bona Fide Reasons**

This Court's now-vacated ruling in *IRAP* correctly acknowledged that *Mandel*'s test applies to constitutional challenges to the exclusion of aliens abroad. *See IRAP*, 857 F.3d at 588.  Under that test, when the Executive gives "a facially legitimate and bona fide reason" for excluding an alien, "courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against the" asserted constitutional rights of U.S. citizens.  *Mandel*, 408 U.S. at 770.

a.    *Mandel* compels the rejection of plaintiffs' Establishment Clause claim. As the district court correctly acknowledged, JA 1055, the Proclamation's entry restrictions rest on facially legitimate reasons:  protecting national security and encouraging foreign governments to improve their information-sharing practices. *See* Procl. § 1.  The Proclamation describes the global review process undertaken by DHS, in consultation with other agencies; the neutral criteria against which all nations were assessed; the subsequent diplomatic engagement process during which the Department of State encouraged nations to improve their performance; and the resulting recommendations of the Acting Secretary of Homeland Security.  *See id*. § 1(a)-(f), 1(i).

The Proclamation further explains that, in accordance with the Acting Secretary's recommendations and after consulting with members of the Cabinet, the

40

President "craft[ed] * * * country-specific restrictions that would be most likely to encourage cooperation given each country's distinct circumstances, and that would, at the same time, protect the United States until such time as improvements occur." *See id*. § 1(h)(i). These facially legitimate and bona fide reasons for the Proclamation's entry restrictions readily satisfy *Mandel*'s test.

      **b.**     Relying on this Court's opinion reviewing the constitutionality of EO-2, the district court held that *Mandel*'s "bona fide" requirement permits courts to look behind the Government's stated reasons to determine whether they were given in good faith. JA 1055 (citing *IRAP*, 857 F.3d at 590-91). But *IRAP*'s holding on that point is no longer good law, not only because it has been vacated as moot, but also because it conflicts with the Supreme Court's subsequent decision in *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1693 (2017), which described *Mandel*'s standard as "minimal scrutiny (rational-basis review)." Rational-basis review is objective and does not permit probing government officials' subjective intentions. *See Western & S. Life Ins. Co. v. State Bd. of Equalization of Cal.*, 451 U.S. 648, 671-72 (1981); *United States R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980).

      Moreover, even apart from *Morales-Santana*, *IRAP*'s holding was not persuasive on its own terms, because it erroneously relied on Justice Kennedy's concurrence in *Din*. Justice Kennedy's concurrence did not propose an enormous loophole in *Mandel*, especially with respect to a formal national-security and

foreign-policy determination of the President. It merely hypothesized that, if the government had not identified a factual basis for the consular officers' decision at issue, the plaintiff might have been able to seek "additional factual details" about the basis of the consular officer's decision (provided the information is not classified). *Din*, 135 S. Ct. at 2141 (Kennedy, J., concurring in judgment). In contrast, when the government does identify a factual basis—as it did in *Mandel* and in *Din* (by citing a statutory provision that itself included sufficient factual predicates), and has also done here through the Proclamation's text—that is the end of the analysis. *See id.* at 2140 (observing that the citation of a statutory ground of inadmissibility involving terrorism indicates that the government "relied upon a bona fide factual basis for denying [the] visa"). Plaintiffs' overreading of the *Din* concurrence also cannot be squared with *Mandel*, where the Court explicitly rejected "look[ing] behind" the government's stated reason for denying a waiver of inadmissibility grounds, 408 U.S. at 770, and declined Justice Marshall's invitation in dissent to take "[e]ven the briefest peek behind the Attorney General's reason for refusing a waiver," which he asserted was a "sham." *Id.* at 778; *see also Morfin v. Tillerson*, 851 F.3d 710, 713 (7th Cir. 2017) (holding that the concurring decision in *Din* "left things as *Mandel* had left them" and that "*Mandel* tells us not to go behind a facially legitimate and bona fide explanation"), *cert. denied*, 2017 WL 3136962 (Oct. 30, 2017).

42

### 2.    The Proclamation Is Valid Under *McCreary*

**a.**    In *McCreary*, the Court asked whether the challenged government conduct had the primary purpose or effect of advancing religion.  545 U.S. at 859-60.  Here, the Proclamation neither mentions nor draws any distinction based on religion, and its "operation," *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 535 (1993), confirms that it is religion-neutral and not intended to discriminate on the basis of religion.

The Proclamation is the result of a months-long worldwide review and process of diplomatic engagement combining the efforts of multiple government agencies and recommendations from the Acting Secretary of Homeland Security to the President regarding whether and what entry restrictions were necessary to address the inadequacies identified.  The President acted in accordance with those recommendations.  Neither plaintiffs nor the district court have even suggested, let alone demonstrated, that the Cabinet secretaries and numerous other government officials involved in that review and consultative process culminating in the Proclamation were acting in bad faith or harbored anti-Muslim animus.

Furthermore, the Proclamation establishes entry restrictions that are tailored to the particular information-sharing deficiencies and terrorism risks in each nation. Of the seven countries from which EO-2 and its predecessor suspended entry, the Proclamation omits two Muslim-majority countries (Sudan and Iraq).  The President

43

concluded that Sudan met the Acting Secretary of Homeland Security's baseline and that, although Iraq fell below the baseline, entry restrictions were not warranted in light of "the close cooperative relationship between the United States and the democratically elected government of Iraq, the strong United States diplomatic presence in Iraq, the significant presence of United States forces in Iraq, and Iraq's commitment to combating the Islamic State of Iraq and Syria (ISIS)." Procl. § 1(g). The Proclamation added entry restrictions for three new countries, two of which are non-Muslim-majority (Venezuela and North Korea) and the third of which has a substantial (approximately 48%) non-Muslim population (Chad). *See* CIA, *The World Factbook: Africa (Chad)*, https://www.cia.gov/library/publications/the-world-factbook/geos/cd.html. The five other Muslim-majority countries included were all previously identified by Congress or the Executive Branch as posing terrorism-related concerns. *See* 8 U.S.C. § 1187(a)(12).

Moreover, the Proclamation tailors the entry restrictions to the particular country, allowing students and exchange visitors from Iran, while restricting business and tourist nonimmigrant entry for nationals of Libya, Yemen, and Chad, and imposing no exclusions on nonimmigrant entry for Somali nationals.

This particularized selection of countries and restrictions would be nonsensical as a supposed "Muslim ban," but is readily justified as a tailored means of encouraging individual countries to improve inadequate information-sharing and

44

of protecting against security risks in the interim, which are obviously purely secular, not to mention compelling, government interests.

**b.**      Citing *McCreary* as principal support, the district court held that these features are insufficient to cure the alleged "taint" from the prior Executive Orders and earlier campaign statements.   JA 1063-64, 1072-75. As a threshold matter, the government strongly disagrees that the history preceding the Proclamation is evidence of anti-Muslim bias.   But more importantly for present purposes, the Proclamation is significantly different from the prior entry suspensions, both procedurally and substantively.   It thus involves nothing remotely like the history of overt and explicit religious displays that were at issue in *McCreary*.   The district court's criticisms of the Proclamation reflect exactly the kinds of improper second-guessing of national security judgments that the Supreme Court has directed the lower courts not to attempt.

In *McCreary*, the Supreme Court was confronted with a history of three successive Ten Commandments displays at a county courthouse.   The first display, of the Ten Commandments standing alone, was clearly unconstitutional under prior Supreme Court precedent, *see* 545 U.S. at 868, and a second display, erected after suit was filed, also focused on religious messages and was authorized by a resolution that clearly endorsed religion.   *See id.* at 870.   The counties then mounted a third display, which "quoted more of the purely religious language of the Ten

45

Commandments than the first two displays had done." *Id.* at 872. The Supreme Court concluded that all the displays plainly violated the Establishment Clause, and that the third display in particular represented nothing more than a "litigating position," and was even more explicitly religious than its predecessors. *Id.* at 871.

*McCreary* is readily distinguishable in multiple respects. The Proclamation, unlike the religious displays in *McCreary*, contains no textual or operational reference to religion. The Proclamation is the result of separate action by the President, based on the study, analysis, and recommendations of multiple government offices and officials (including four Cabinet-level officials), none of whom plaintiffs suggest had a religious basis for making the recommendations and providing the advice that culminated in the Proclamation. In addition, EO-2, which expired by its own terms, *see* p. 7*, supra*, itself expressly repudiated the notion that it was motivated by or intended to display religious animus, *see* EO-2 §§ 1(b)(iv), (h)(i). These are exactly the kinds of "genuine changes in constitutionally significant conditions" that *McCreary* held defeat any claim that the government has acted with an "implausible" secular purpose. 545 U.S. at 874.

Similarly in *McGowan*, the Supreme Court held that a Sunday closing law's secular exemptions were sufficient to establish that the law no longer was motivated by its original religious purpose of observing the Sabbath, even though the law still contained expressly religious references. 366 U.S. at 445. Here, likewise, the

46

limited restrictions and express exclusions for certain Muslim-majority nations (as well as the process of review and recommendation by government officials whose motives have never been questioned) make clear that the Proclamation implements a good-faith and secular national-security objective. *See Salazar v. Buono*, 559 U.S. 700, 715-16 (2010) (plurality op.) (criticizing a district court for "dismissing Congress's motives" for transferring land on which a cross had been unconstitutionally erected to a private party as "illicit" rather than attributing a "reasonable," lawful purpose for Congress's actions).

**c.** The district court gave several specific reasons for questioning the Proclamation's secular bona fides, but none withstands even minimal scrutiny, and all represent an inappropriate effort to second-guess national-security determinations that are constitutionally committed to the Executive.

The district court first considered it significant that "the underlying architecture of the prior Executive Orders and the Proclamation is fundamentally the same," reasoning that each "bans the issuance of immigrant and non-immigrant visas on the basis of nationality to multiple majority-Muslim countries on the basis of concerns about terrorism." JA 1067-68. But the Proclamation's "architecture" is in fact fundamentally different, because it reflects a multi-agency review and recommendation process and tailored substantive restrictions. The district court's troubling suggestion that none of this matters because countries that are Muslim-

47

majority are still included in the Proclamation threatens to permanently disable the President from addressing terrorism-related concerns relating to nationality in the very countries where those concerns are currently the most acute. In similar contexts, the Supreme Court has held that the constitutionality of a facially neutral government program "does not turn on" statistical evidence regarding the expected religious/secular impact of that program at any given time. *Zelman v. Simmons-Harris*, 536 U.S. 639, 658 (2002).

The court then questioned the Proclamation's secular purpose, asserting that "the outcome of the DHS Review was at least partially pre-ordained." JA 1068. That assertion ignores the relevant EO-2 provisions governing the review process, which directed the Secretary of Homeland Security to establish the criteria by which to identify "*whether, and if so what*, additional information will be needed from each foreign country," EO-2 § 2(a) (emphasis added), and to provide a list of any "countries recommended for inclusion in a Presidential proclamation that would prohibit the entry of *appropriate categories* of foreign nationals of countries that have *not provided the information requested*," *id.* § 2(e) (emphases added). Nothing in those provisions cabined the independent judgment of the Acting Secretary of Homeland Security—whose good-faith has *never* been called into question— to decide whether and which countries to recommend for appropriate entry restrictions.

The district court ascribed additional significance to the fact that "a comparison of EO-2 with the Proclamation reveals that many of the criteria considered in the DHS Review, and used to justify the ban on specific countries in the Proclamation, were substantially similar to those used to select the list of countries banned by EO-2." JA 1068-69. As explained, however, the criteria used were religion-neutral, reflect compelling government interests in national security, and are similar to the criteria that Congress and other Presidents have relied on in the past in previously identifying countries that pose heightened terrorism risks. *See* pp. 5-7, 31-34, 40-45, *supra.* For example, the fact that Iran "regularly fails to cooperate with the United States Government in identifying security risks" and "is the source of significant terrorist threats," Procl. § 2(b)(i), are exactly the compelling, secular concerns that those charged with protecting our country's national security *should* be considering—and that is precisely why both the agencies and the President chose to consider them.

The district court also inferred anti-Muslim bias because the Proclamation supposedly treats countries with similar deficiencies differently, in a manner that is asserted to have "a disproportionate impact on majority-Muslim nations" and to manifest animus rather than "flow from the objective factors considered in the review." JA 1070. But the seemingly different treatment is instead explained by different circumstances, as outlined in the Proclamation itself. For example,

49

although Somalia generally satisfies the information-sharing baseline, it not only "has significant identity-management deficiencies" but "stands apart from other countries in the degree to which its government lacks command and control of its territory." Procl. § 2(h). Likewise, although Venezuela's "government is uncooperative in verifying whether its citizens pose national security or public-safety threats," it "has adopted many of the baseline standards identified by the Secretary of Homeland Security" and the United States has "alternative sources for obtaining information to verify the citizenship and identity of nationals from Venezuela." *Id.* § 2(f)(i). These country-specific differences, rather than animus, are the self-evident basis for the differing treatment.

The district court also diminished the significance of the inclusion of North Korea in the list of countries subject to entry restrictions on the basis that the restrictions were of "little practical consequence" because that country would likely involve "only a fraction of one percent of all those affected by the Proclamation." JA 1066. The inclusion of those non-Muslim-majority countries in the Proclamation underscores the Proclamation's religion-neutral purpose and effect, and the Proclamation sets forth valid reasons for concluding that the inclusion of those countries is important.

The district court further asserted that the country-based entry restrictions in the Proclamation are "unprecedented," distinguishing prior country-based entry bans

50

on the basis that they applied to "a single nation" "in response to a specific diplomatic dispute." JA 1071. But the President determined that each of the eight countries presented specific risks warranting entry restrictions, just as the Iran and Cuba restrictions were the result of specific problems relating to those countries. The entry restrictions are commensurate with the problem they are intended to address, and that does not change simply because more than one country presents the problem.

The district court also maintained that "[d]efendants offer no evidence * * * showing an intelligence-based terrorism threat justifying a ban on entire nationalities," and suggested that individualized assessment of nationals from those countries could adequately protect against the threat. JA 1071. Where the government faces a structural problem that is common to all nationals of a foreign country, however, it surely has the latitude to address the problem on a national basis—particularly where one of the goals sought to be attained is to encourage that country to change its practices nationwide to address the problem. The district court's reasoning was particularly problematic because it involved second-guessing the President's predictive judgments about what is necessary to protect the country against national-security risks, which are entitled to the utmost deference. *See AAADC*, 525 U.S. at 491 (noting that courts are generally "ill equipped to determine the[] authenticity and utterly unable to assess the[] adequacy" of the Executive's

51

"reasons for deeming nationals of a particular country a special threat"); *Holder v. Humanitarian Law Project (HLP)*, 561 U.S. 1, 28 (2010). The district court purported to acknowledge that it was required to defer to that judgment, yet immediately, and improperly, rejected it in the guise of assessing whether the government acted with a permissible secular purpose. JA 1072.

Finally, the court concluded that statements by the President and his advisors show that the Proclamation fundamentally rests on an illicit religious purpose. The President's campaign statements are irrelevant for reasons already discussed, *see* pp. 45-47, *supra*, and the cited statements that occurred after the issuance of EO-2 do not reflect any religious animus, but the compelling secular goal of protecting national security from an amply-documented present threat. That reading is consistent with other statements, such as the President's statements in an official address praising Islam as "one of the world's great faiths;" decrying "the murder of innocent Muslims;" and emphasizing that the fight against terrorism "is not a battle between different faiths, different sects, or different civilizations," but one "between barbaric criminals who seek to obliterate human life, and decent people of all religions who seek to protect it." Pres. Donald J. Trump, *Speech to the Arab Islamic American Summit* (May 21, 2017), httpps://www.whitehouse.gov/the-press-office/2017/05/21/president-trumps-speech-arab-islamic-american-summit.

52

In sum, the district court plainly erred in holding that plaintiffs have a likelihood of success on their Establishment Clause claim. And because plaintiffs' Equal Protection claim rests on the same religious-purpose allegations as their Establishment Clause claims, it fails for the same reasons.

## III.    The Balance of Harms Weighs Strongly Against Preliminary Relief

### A.    The District Court's Injunction Imposes Serious, Irreparable Harm On The Government And The Public

**1.**    The district court's injunction barring enforcement of the Proclamation's entry restrictions undermines the President's constitutional and statutory authority to safeguard the Nation's security and intrudes on the political branches' constitutional prerogatives. "[N]o governmental interest is more compelling than the security of the Nation," *Agee*, 453 U.S. at 307, and "the Government's interest in combatting terrorism is an urgent objective of the highest order," *HLP*, 561 U.S. at 28.

The injunction also causes irreparable injury by invalidating an action taken at the height of the President's authority. "[T]he President has unique responsibility" over "foreign and military affairs." *Sale*, 509 U.S. at 188. Rules "concerning the admissibility of aliens" necessarily rely on not just legislative authority but also "inherent executive power." *Knauff*, 338 U.S. at 542. And because "the President act[ed] pursuant to an express * * * authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress

53

can delegate." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2083-84 (2015).

The district court's injunction overriding the President's judgment thus necessarily imposes irreparable harm. Even a single State "suffers a form of irreparable injury" "[a]ny time [it] is enjoined by a court from effectuating statutes enacted by representatives of its people." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers); *see, e.g.*, *O Centro Espirita Beneficente Uniao de Vegetal v. Ashcroft*, 314 F.3d 463, 467 (10th Cir. 2002). *A fortiori*, this injunction imposes irreparable injury on the President and the public given "the singular importance of [his] duties" to the entire Nation. *Nixon v. Fitzgerald*, 457 U.S. 731, 751 (1982).

**2.**    The district court held that "Defendants are not directly harmed by a preliminary injunction preventing them from enforcing a Proclamation likely to be found unconstitutional," JA 1077-78, but that ignores the harm if, instead, the Proclamation is ultimately held to be constitutional. The district court also expressed the view that "[d]efendants have not shown that national security cannot be maintained without an unprecedented eight-country travel ban," and that "[e]ven with an injunction, visa applicants from the Designated Countries would be screened through the standard, individualized vetting process under which the burden is on the individual applicants to prove that they are not inadmissible to the United States."

54

JA 1078. That approach improperly second-guessed the President's national-security determination, by disregarding that the purpose of the entry restrictions is to encourage the covered countries to improve their information-sharing practices and to protect this country in the interim in light of the adverse effect those inadequate practices have on individualized vetting and screening. And it also ignores that waivers are available on a case-specific basis under the Proclamation.

### B.    A Preliminary Injunction Is Not Necessary To Prevent Any Substantial Harm To Plaintiffs

Plaintiffs, by contrast, would suffer no cognizable harm, much less irreparable injury, if the Proclamation's entry restrictions are allowed to take effect. The district court cited "prolonged separation from their family members," JA 1077, but delay in entry alone does not amount to irreparable harm. As already noted, visa times vary widely, and it is not unusual for an alien to wait months or years for an immigrant visa. Until aliens abroad meet otherwise-applicable visa requirements and seek and are denied a waiver, they have not received final agency action, and plaintiffs' claimed harms are too "remote" and "speculative" to merit injunctive relief. *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991).

The district court also concluded that plaintiffs' Establishment Clause claims show irreparable harm *per se*, JA 1076-77, but the cited cases all involved plaintiffs whose own Establishment Clause rights were violated. The district court cited no

case supporting the proposition that a plaintiff challenging alleged religious discrimination against third parties has established irreparable harm per se.

## C.    The Global Injunction Is Improper

At a minimum, the district court erred because Article III and equitable principles require that any injunction be limited to redressing plaintiffs' own cognizable, irreparable injuries. *Lewis v. Casey*, 518 U.S. 343, 357 (1996); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). The global injunction is vastly overbroad, notwithstanding the district court's exclusion of "[i]ndividuals lacking a credible claim of a bona fide relationship with a person or entity in the United States." Order 2. Although the Supreme Court so narrowed the injunctions against EO-2, *see Trump*, 137 S. Ct. at 2088-89, the Court did not conclude that similar relief was required in all circumstances, and it tailored its stay to its assessment of the equities. This case is very different for the reasons described, and the equitable balancing requires following the ordinary rule of plaintiff-specific relief.

## CONCLUSION

For these reasons, the district court's preliminary injunction should be reversed. At a minimum, it should be vacated except for those aliens whose exclusion would impose a cognizable, irreparable injury on plaintiffs.

56

Respectfully submitted,

NOEL J. FRANCISCO
  *Solicitor General*

JEFFREY B. WALL
EDWIN S. KNEEDLER
  *Deputy Solicitors General*

CHAD A. READLER
  *Acting Assistant Attorney General*

STEPHEN M. SCHENNING
  *Acting United States Attorney*

HASHIM M. MOOPPAN
  *Deputy Assistant Attorney General*

DOUGLAS N. LETTER
/s/ Sharon Swingle
SHARON SWINGLE
H. THOMAS BYRON III
LOWELL V. STURGILL JR.
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7241*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-2689*

NOVEMBER 2017

57

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-face requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-volume limitations of Rule 32(a)(7)(B). The brief contains 12,711 words, excluding the parts of the brief excluded by Fed. R. App. P. 32(f).

/s/ Sharon Swingle
Sharon Swingle

## CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2017, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ Sharon Swingle
Sharon Swingle